******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MULLINS, C. J., with whom DANNEHY, J., joins, dissenting. This tragic case requires us to determine whether the trial court's admission into evidence of two prior incidents of misconduct was improper and so harmful that the defendant's conviction of assault in the first degree for maiming the mother of his children by repeatedly stabbing her should be overturned. The two prior incidents at issue were that, once, in 2008, the defendant, Marcello E., hit the victim, and that, once, in 2009, the defendant punched the victim.[1] For purposes of this dissent, I will assume that the trial court abused its discretion in allowing the victim to testify about the two prior incidents. I cannot, however, agree with the majority that the defendant has met his burden of demonstrating that this evidentiary error was harmful. Thus, I respectfully dissent.

During the trial, the state's first witness, Chris Hunyadi, an officer with the Hartford Police Department, explained that he was the first law enforcement officer to arrive at the scene of the crime in response to a 911 call indicating that a person had been stabbed. When Hunyadi arrived, he saw the victim lying in a large "pool of blood," and he could tell that she had been stabbed.

Shortly after the stabbing, the victim was transported to a hospital. Hunyadi went to the hospital, and, while the victim was under the influence of "a decent amount of pain medication," he asked her if she had seen her assailant. At that point in time, she said she had not. Testimony established, however, that the victim had in

---

[1] Prior to trial, the court made clear that the prosecutor "shall elicit testimony regarding [the] two prior incidents in a noninflammatory manner." The prosecutor was not permitted to question the victim about police involvement or court proceedings that may have followed the incidents or to elicit any testimony that, as the victim testified to in the proffer, there was a lot of blood after the defendant had punched her in the mouth. The prosecutor adhered to the trial court's limitations.

fact identified the defendant as the assailant on the night of the incident.

At trial, the victim testified very briefly regarding the two incidents, shorn of any real detail. See footnote 1 of this opinion. With respect to the 2008 incident, she testified that, at that time, she was in a romantic relationship with the defendant. The victim explained that they had two children, a son, J, and a daughter, S, and that they were all living together. In March, 2008, the victim and the defendant got into an "argument" in which she "asked him to leave, and it became verbal, and then it became physical," and he "hit" her. Then, in October, 2009, the victim's "car had overheated," and, when the defendant arrived to help her get to work, an argument ensued, and he punched her in the face. Immediately after this testimony, the trial court issued a limiting instruction, informing the jury that it could not consider this evidence as proof of the defendant's bad character or any predisposition on the part of the defendant to commit the assault in this case.[2]

---

[2] The trial court stated in relevant part: "Ladies and gentlemen, I just want to give you an instruction at this point. You recall [that], in the preliminary instructions I gave you a short time ago, I mentioned evidence that may be admitted for a limited purpose. Just now, you've heard [the victim] describe incidents that she stated occurred in 2008, and another incident that occurred in 2009, during the course of a relationship with the defendant, and that, in each of those incidents that she described, there was a physical assault by the defendant against her person.

"This evidence of alleged conduct of the defendant prior to the date of the charged offense, which, as you know, occurred in 2011, is—these prior acts are not being admitted to prove the bad character, propensity or criminal tendencies of the defendant but solely to show or . . . establish what the defendant's intent may have been at the time he's alleged to have committed the specific crime charged here. You may not consider the evidence of these prior acts as establishing a predisposition on the part of the defendant to commit the crime charged or [as] demonstrat[ing] that [the defendant] has a criminal propensity to engage in criminal conduct. You may consider this evidence of these prior incidents only if you believe [they] occurred and, further, only if you find that [their occurrence] logically, rationally and conclusively bears on the issue of whether . . . the defendant had the intent to commit the crime that is charged in this case.

"On the other hand, if you do not believe the evidence of these prior

After this brief testimony, which, in the trial transcript, spans approximately two pages of the twenty-six pages of the victim's testimony, the victim explained the circumstances of the night of the attack. She told the jury that, after picking S up from the defendant's home, where he lived with his mother, O, she stopped at a grocery store. Then, when she arrived home, S went inside the house first. The victim followed, and, when she turned around to close and lock the door, "[the defendant] ran in front of [her] and started stabbing [her]." She testified, "[i]nitially, I thought he was just beating me up. I didn't think I was being stabbed at that time." She confirmed that the defendant had nothing covering his face when he committed this assault. During the assault, the victim yelled for their thirteen year old[3] son, J, to come help her. J came from inside the house, "picked [the victim] up," brought her back inside, "and locked the door." The victim then realized that the defendant had stabbed her. She further testified that, "I felt my leg, and I saw that I was stabbed

incidents, or even if you do, if you do not find that it logically, rationally, and conclusively bears on the issue of the defendant's intent at the time of the crime charged in this case, then you may not consider this testimony relating to the incidents in the past for any purpose whatsoever. In other words, you may not allow your mind uncritically to believe that the defendant must be or is more likely to be the person who committed the crime charged in this case merely because of the misconduct he may have directed toward [the victim] previously; nor may you believe that the defendant is or is more likely to be guilty of the offense here charged merely because of the alleged prior misconduct.

"Rather, as I have explained, you are permitted to consider this evidence of prior incidents between the defendant and [the victim], as [the victim] has just described [the incidents], only if you believe that they occurred, and then only to the extent that you find their occurrence may bear on the issue of whether the defendant possessed the requisite intent to commit the crime alleged in this case. These alleged prior incidents may not be considered by you for any other purpose." The trial court included another limiting instruction with respect to this evidence in its charge at the end of the trial.

[3] There was conflicting evidence regarding J's age at the time of the assault. See *State* v. *Marcello E.*, 216 Conn. App. 1, 5 n.2, 283 A.3d 1007 (2022).

in my leg. And, at that point, I think the adrenaline wore off, and I started feeling pain all over my body, and I just felt all the blood coming down." And it was then, at the moment immediately after the stabbing, after J brought her back inside the house, that the victim said, "your father stabbed me."

The law governing harmless error for nonconstitutional evidentiary claims is well settled. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the [improperly admitted evidence] in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, [this court] must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when [this] court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State v. Outlaw*, 350 Conn. 251, 283–84, 324 A.3d 107 (2024).

In my view, placing the burden on the defendant, where it properly lies, the defendant has not demonstrated that the trial court's admission of the two prior incidents substantially affected the jury's verdict in this case. The state presented strong evidence of the defendant's guilt. The victim's testimony was compelling, consistent and corroborated circumstantially by other witnesses who had no apparent bias. The defendant's

alibi evidence was weak, lacked believability and was supported by witnesses—his mother, O, and his sister, D—who were not disinterested. Nevertheless, the majority concludes that the trial court's admission of the evidence of prior misconduct was harmful because the evidence the state presented to establish that it was the defendant who committed the assault "was equivocal . . . ." I disagree that the evidence in the present case was equivocal.[4] Instead, I would conclude that the evidence established beyond a reasonable doubt that the defendant had assaulted the victim.

The victim's testimony about the attack left no doubt about who her attacker was. Specifically, she testified unequivocally that "[the defendant] ran in front of [her] and started stabbing [her]." The victim's testimony was corroborated by multiple witnesses.

First, J's testimony was consistent with the victim's testimony. J explained that, after he had dragged the victim inside of the house in the minutes after the bloody attack, she told him that "[his] father" was the assailant. J further testified that, on the night of the attack, he told the police that the victim had identified the defendant as the person who attacked her. He also testified that, on the night of the incident, he, too, had identified the defendant as the person who attacked the victim.[5] J told the jury that, on the night of the

_____

[4] In his dissent in the Appellate Court, Judge Bishop characterized the evidence as being "in equipoise . . . ." *State* v. *Marcello E.*, 216 Conn. App. 1, 56, 283 A.3d 1007 (2022) (*Bishop, J.,* dissenting). The majority of this court disagrees with this characterization and concludes that the evidence "was equivocal . . . ." In my view, the evidence was neither equivocal nor in equipoise.

[5] The following colloquy occurred between defense counsel and J:

"Q. You, yourself, didn't identify your father that night. Correct?

"A. I don't remember.

"Q. Did you ever tell the police that—

"A. Yeah, I did tell the police. When it happened, ten years ago, I told them that was my father, yes.

"Q. And where—did you tell that [during] the 911 call?

"A. I don't know. You'd have to play it for me.

incident, he told a police officer that the assailant "looked like [his] father." This testimony was consistent with the statement he gave to the police approximately three weeks after the attack.

Second, Luis Poma, a former detective in the major crimes division of the Hartford Police Department who had investigated this case, testified that, on the night of the attack, J told him that the victim had identified the defendant as her assailant. Poma further testified that, on the night of the attack, he went to the defendant's home because the police had identified "a possible person of interest." The victim's testimony was also corroborated by Poma's testimony that the victim had identified the defendant as her assailant from a photographic array approximately five days after the attack.

Third, Valentine Olabisi, a supervisor in the patrol division of the Hartford Police Department, testified that he was a patrol officer on the night the victim was attacked. Olabisi explained that, on the basis of his preliminary investigation at the scene, he had identified the defendant as a "potential suspect" that night. Olabisi further testified that he also went to the defendant's home that night to speak with him, separately from Poma. All of these witnesses not only corroborated

---

"Q. Okay. Did you tell any of the police that night?

"A. Yeah, I probably did, one of the officers, I probably did tell them it was my father.

"Q. Probably did or you did, or you don't remember?

"A. *I did. I did tell them it was my father.*

"Q. But you saw your father—I beg your pardon. You, yourself, saw an individual in black, right, attacking your mother?

"A. Yeah.

"Q. Okay. But you, yourself, never testified or identified him as being involved. Correct?

"A. *I did ten years ago.*" (Emphasis added.)

This testimony reflects that, despite defense counsel's attempt to force J to admit that only the victim had identified the assailant as the defendant that night, J testified that he told the police that the attacker was the defendant on the night of the attack.

the victim's testimony identifying the defendant as the assailant, but also corroborated the fact that the defendant was a suspect in the attack from moments after it occurred.[6]

On the basis of the foregoing, I would conclude that the state offered ample evidence that proved beyond a reasonable doubt that the defendant had committed the assault on the victim that night. Therefore, it is highly unlikely that the two prior incidents had any significant impact on the jury or the result of the trial. Indeed, the prior incidents played a minimal role in the state's case, in which the prosecutor presented the testimony of eight witnesses over the course of two days. The misconduct evidence came in very briefly at the beginning of the victim's testimony, encompassing approximately 2 pages of a trial transcript that is more than 350 pages in length. See, e.g., *State* v. *Thompson*, 266 Conn. 440,

---

[6] The majority remarks that "[t]he earliest record demonstrating the victim's identification of the defendant as her assailant occurred five days following the attack, after the police showed her the photographic array, which included the defendant's photograph." Although I agree that the record indicates that the victim had first identified the defendant to the police about five days after the incident, this is not remarkable because the victim was in the hospital undergoing medical treatment for several days following the attack. Poma testified that the victim was still in the hospital five days after the attack, when he went to speak with her and to show her the photographic array, and that he had made three or four prior attempts to speak with her.

The majority remarks that "[t]he record does not explain what led the police to present the victim with a photographic array that included someone whom she obviously knew: her former boyfriend and the father of her two children." Footnote 9 of the majority opinion. I disagree. The record is replete with evidence that demonstrates that the defendant was a suspect from the night the crime happened—the victim told J that the defendant had assaulted her, J told Poma that the defendant had assaulted her, and Hartford police officers went to speak with the defendant that night. Thus, because the defendant was clearly a suspect on the night of the crime, I see no reason why the defendant would not have been included in a photographic array that was presented to the victim. To be sure, the defendant did not raise at trial, and does not raise on appeal, any claim that the photographic array was improper or unnecessarily suggestive.

456, 832 A.2d 626 (2003) (improperly admitted evidence was harmless when it was not repeated during trial and prosecutor did not emphasize or rely on it during closing argument); see also, e.g., *State* v. *James G.*, 268 Conn. 382, 401, 844 A.2d 810 (2004) (admission of prior misconduct evidence did not result in "a trial within a trial" when evidence consisted of only 25 pages of approximately 500 pages of trial transcript, and prosecutor "did not belabor his examination of [the witness]" (internal quotation marks omitted)). The prosecutor did not mention the incidents again until the cross-examination of the defendant, who chose to testify at trial. During direct examination, defense counsel brought it up again when he asked the defendant if he and the victim had "troubles," to which the defendant responded, "like any other couples, yes." After that, during cross-examination, the defendant confirmed that he had physical altercations with the victim and that, around 2008, they had stopped living together. The prosecutor mentioned this evidence only briefly during closing argument, and it was not a central piece of the closing, by any means.

Additionally, "[t]his court repeatedly has held that [t]he prejudicial impact of uncharged misconduct evidence is assessed in light of its relative viciousness in comparison with the charged conduct." (Internal quotation marks omitted.) *State* v. *Patterson*, 344 Conn. 281, 298, 278 A.3d 1044 (2022). Here, the two prior incidents were decidedly less vicious than the brutal stabbing at issue in this case. Because the prior incidents were far less severe than the conduct involved and injuries stemming from the charged offense, it was unlikely that the prior misconduct evidence had unduly aroused the emotions of the jurors. See, e.g., id., 298–99.

And, further mitigating any harm, is the fact that the trial court gave several limiting instructions. See, e.g., *State* v. *Paul B.*, 315 Conn. 19, 32, 105 A.3d 130 (2014) ("[a] trial court's limiting instructions about the

restricted purpose for which the jury may consider [certain] evidence serve to minimize any prejudicial effect that such evidence otherwise may have had" (internal quotation marks omitted)). The trial court informed the jury, in its preliminary instructions, that certain evidence may be considered only for a limited purpose. Then, immediately after the victim testified about these two incidents, the court gave a specific limiting instruction. Subsequently, in the court's final charge, it again gave the jury a limiting instruction regarding this evidence.

The defense responded to the state's case and presented an alibi defense. In doing so, the defense called three witnesses—the defendant, D, and O. This evidence was unconvincing, at best.[7]

The defendant's testimony was filled with inconsistencies. For instance, he testified that he had lived with O for approximately sixteen or seventeen years prior to the night in question but then later stated that he had lived with the victim until around 2008. He testified that he was at home all day on the day the victim was attacked, except for leaving for a short time to pick S up from school and to take her to a fast-food restaurant. But Olabisi testified that, when the defendant was questioned on the night of the attack, he said that he was home all day. The defendant never mentioned leaving to pick S up or to take her to the restaurant. In addition, the defendant testified that he had cooperated with Olabisi and had provided his driver's license when Olabisi asked him for it, but Olabisi testified that the defen-

---

[7] Although the defendant argues, and the majority accepts, that identity was the only real issue at trial, when the trial court decided the motion in limine, this was not clear. Defense counsel never raised that as a basis to exclude evidence regarding intent. Nevertheless, I take this opportunity to remind trial courts to exercise caution when considering the admissibility of misconduct evidence and to defer a ruling on such evidence until such point that there is a clear understanding of the evidence that will be introduced at trial.

dant had failed to provide his driver's license or other identification card, and only confirmed "his name and date of birth."

Perhaps most significant, the defendant's alibi—that he was home all day—was contradicted by S's testimony. S testified that, although she had been with the defendant at his home earlier in the afternoon on the day the victim was attacked, before the victim came to pick her up, S saw the defendant leave the house with a backpack and get into a nearby car. S explained that she did not see the defendant come back home before she left with the victim around 5:30 p.m. It could not have been lost on the jury that S, who was eight years old at the time of the assault, had no reason to lie about the defendant's leaving the home, whereas the defendant did have a motive to lie about being home all day. Not only was S eight years old at the time of the assault, but the evidence introduced at trial showed that she had a good relationship with the defendant, O, and D. The defendant picked S up from school each day and brought her to the home he shared with O and D. From that information, the jury could have inferred that S had no motivation to lie in a way that would hurt the defendant. Given all of the evidence, it is likely that the jury placed significant weight on S's testimony that the defendant had left the home and concomitantly disbelieved the defendant's claim that he was home all day.

The defendant's other alibi witnesses, O and D, were no better. O and D testified that the defendant was home and asleep immediately prior to Olabisi's arrival to speak with the defendant on the night of the attack. This court has recognized that "[t]he credibility of . . . [the] witnesses is questionable because they are the parents of the defendant and, even subconsciously, their parental instincts may have led them to protect their son and [to] offer favorable testimony on his behalf."

*State* v. *Greene*, 209 Conn. 458, 473, 551 A.2d 1231 (1988). Notwithstanding O's and D's attempts to corroborate the defendant's alibi for the time of the attack, neither of them was able to testify to being with him all day. Indeed, D testified that she arrived home *after* S left with the victim. Consequently, D was not home to know whether the defendant left the home as S had said he did.

For her part, O testified that she was home taking care of D's child. Although O testified that no one could have left the house through the kitchen door without her knowledge, the evidence established that there were two exterior doors in the home—the kitchen door and a front door. The front door was not visible from O's bedroom and was immediately adjacent to the stairs leading to the room where the defendant testified he was staying.

Therefore, even if the jury believed O and D, it could have also concluded that the defendant would have been able to go down the stairs and to exit through the front door without O having seen him. The jury could also have concluded that the defendant could have committed the assault and still have made it home by the time O and D went looking for him. Indeed, O's and D's testimony established only that the defendant was home sleeping in the minutes prior to when Olabisi arrived. A reasonable jury could have concluded that neither O nor D was able to corroborate the defendant's alibi.

The majority concludes that the evidence in this case establishing the defendant as the perpetrator of the assault on the victim "was equivocal . . . ." First, the majority places great weight on whether the state established that the victim had identified the defendant as the assailant on the night of the incident and asserts that "the evidence adduced at trial was not entirely

clear regarding whether the victim in fact identified the defendant as her attacker that night." Footnote 1 of the majority opinion. It is important to remember that identifying the defendant as the assailant *on the night in question* is not an element that the state was required to prove. The state needed to prove only that the defendant had perpetrated the crime.

Nevertheless, I disagree with the impact on the jury of the majority's perceived equivocation of the evidence on this point. First, the majority underappreciates the fact that Poma also testified that, on the night of the incident, J told him that the victim had identified the defendant as her assailant. In addition to Poma's testimony, the victim testified unequivocally at trial that the defendant had attacked her, and J also identified the defendant as the assailant. Despite this evidence, the majority is swayed by the fact that, on the night of the attack, after the victim was transported to the hospital and given an unspecified amount of pain medication, she also "told a police officer that she did not recognize or see the person who had stabbed her." Id. Although I agree that Hunyadi testified that, when he spoke with the victim at the hospital on the night in question, she told him that she did not recognize her assailant, a reasonable jury likely placed this testimony in context, understanding that Hunyadi also testified that the victim had been given a substantial amount of pain medication shortly before he spoke with her.

In addition, a reasonable jury could infer that the victim had endured a traumatic event that night and was likely in a great deal of pain, so her ability to communicate and answer questions accurately would have been severely limited. I certainly do not conclude that the evidence is now equivocal because of that one statement the victim made while in the hospital and on pain medication. Instead, I look at the import of all of the evidence, namely, when her adrenaline was high,

and she wasn't yet aware she was stabbed, the victim stated that the assailant was the defendant. J also said it was the defendant. Poma testified that J had told him it was the defendant. The police proceeded to question the defendant that night. The victim's one statement in the hospital, given while the victim was under the influence of medication and after she was stabbed across multiple parts of her body, including her head, does not make me, and likely did not make the jury, question all of the prior identifications.

Second, the majority concludes that it is not clear that J had identified the defendant as the attacker on the night in question. The majority asserts that "J called 911 that night but did not identify the defendant as the assailant while on the phone with the police." Id. At trial, J testified that he did not remember whether he had identified the defendant as the assailant when he called 911. Poma testified that J did not identify the defendant by name in the 911 call, but the recording was not entered into evidence, and this court does not know what J said during that call. In any event, given the highly charged nature of this moment, I would presume that J's more important task, while holding his badly bleeding mother, was getting her the help she needed rather than ensuring that he identified his father by name as the assailant during the 911 call.

Third, the majority relies on the fact that there was no "written record" or "recorded evidence" that the victim had identified the defendant as her assailant on the night of the attack as a reason for why the evidence "was not . . . clear . . . ." Id. This misses the point. There is no requirement that the state produce a written record or recorded evidence of the identification; the testimony of multiple witnesses is sufficient. The actions of the police on the night in question—namely, sending three officers, including Poma and Olabisi, to the defendant's home and attempting to speak with him

on multiple occasions—demonstrate that the defendant was a suspect on the night of the attack.

Furthermore, the majority's focus on whether the victim had identified the defendant on the night of the attack seems to imply that, if he was not identified that night, the victim's subsequent identifications of him in the photographic array and in court are questionable. Meanwhile, the majority simply accepts the testimony of O and D, without subjecting it to the same level of scrutiny. The state established that O and D were present on the night of the attack when Olabisi was questioning the defendant about his whereabouts; however, they did not offer any alibi for the defendant at that time. After hearing the police explain that the victim was stabbed and question the defendant about his whereabouts, neither O nor D said that he was at home with either one or was willing to cooperate with the police.[8]

The majority highlights the fact that J and S, who were thirteen and eight at the time of the assault, respectively, did not give their written statements to the police until several weeks after the incident, suggesting that those statements were questionable. But the majority does not mention that O and D never made any statement to the police. Indeed, the evidence in the record is that the first time that they offered information related to the defendant's whereabouts on the day of the attack was approximately eight years later, at the trial. J and S were minors at the time of the assault, and their mother, the victim, was in the hospital undergoing medical treatment and surgeries during the days and weeks following the incident. Any delay by the police

---

[8] The majority indicates that Olabisi "also spoke with O and . . . D, both of whom were home at the time, but he did not ask for their statements or create notes summarizing their conversations." Olabisi testified that O and D were there but that he did not get their names, as "they were not cooperative, and they wouldn't provide any information."

in taking a formal statement could easily have been attributed to that. In contrast, O and D were adults who were present when Olabisi questioned the defendant on the night of the incident, and there is no evidence that they offered any alibi at that time or in the intervening eight year period; rather, the evidence is that they would not give Olabisi their names or cooperate on the night of the attack. Accordingly, I simply cannot agree with the majority's assessment of the relative strength of the state's case in this regard.

Finally, the majority concludes that, "*even if* the jury was more likely to credit the state's witnesses, [the majority] remain[s] unconvinced that the error was harmless because, without the prior misconduct evidence and considering the dangerous 'fine line' between the admitted evidence and propensity evidence, the remaining evidence was *sufficiently* equivocal as to the defendant's identity to warrant [the majority's] conclusion of harmful error." (Emphasis in original.) Not only is the majority adopting a new category of cases in which evidence is "sufficiently equivocal," but its conclusion that the evidence in this case was equivocal is misplaced. (Emphasis omitted.) Unlike other cases in which this court has remarked that the evidence is equivocal, in the present case, the state did not rely solely on the victim's testimony to establish the defendant's identity. Instead, the state also introduced the testimony of J, who also identified the defendant as the perpetrator. The majority discounts J's testimony because he "was hesitant at trial to unequivocally testify that his father was the assailant, requiring the prosecutor to refresh [J's] memory with [his] written statement . . . ." Footnote 1 of the majority opinion. This position ignores the reality of this case. J was a thirteen year old boy when his mother, the victim, was attacked. Not only does he have the memory of the bloody incident and has had to watch his mother live with the injuries

she sustained that night, but, approximately eight years later, he is being forced to testify at a criminal trial against his father, the defendant. Of course he is "hesitant . . . ." Id. A review of J's testimony, however, reveals that, although he was not happy about testifying at trial, he consistently testified that the victim had told him that it was the defendant who attacked her and that his memory of the day of the assault was clearer eight years ago than it was at trial. Contrary to the majority, I would conclude that the facts that J was the son of the victim and the defendant, and that he had identified the defendant as the assailant shortly after the incident, as well as eight years later, at trial, likely made his testimony more persuasive to the jury. Therefore, I disagree with the majority that the evidence in this case was "sufficiently equivocal . . . ." (Emphasis omitted.) Id.

Accordingly, after having reviewed the entire record, given the strength of the state's case and the lack of importance of the improperly admitted evidence to the state's case, I would conclude that the defendant did not meet his burden of establishing that the jury's verdict was substantially swayed by the improperly admitted evidence.

For the foregoing reasons, I respectfully dissent.